*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0359P (6th Cir.)
File Name: 00a0359p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MERRIANNE WEBERG, et al.,
     *Plaintiffs-Appellants,*

     *v.*

RANDY FRANKS, et al.,
     *Defendants-Appellees.*

No. 98-1472

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-74635—Denise Page Hood, District Judge.

Argued: June 17, 1999

Decided and Filed: October 10, 2000

Before: KRUPANSKY, RYAN, and SUHRHEINRICH,
Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Brian J. Richtarcik, CHAPMAN & ASSOCIATES, Bloomfield Hills, Michigan, for Appellants. Katherine C. Galvin, OFFICE OF THE ATTORNEY GENERAL, PUBLIC EMPLOYMENT AND ELECTIONS DIVISION, Lansing, Michigan, for Appellees. **ON BRIEF:** Ronald W. Chapman, CHAPMAN & ASSOCIATES, Bloomfield Hills, Michigan, for Appellants. John Fitzgerald

Szczubelek, OFFICE OF THE ATTORNEY GENERAL, PUBLIC EMPLOYMENT AND ELECTIONS DIVISION, Lansing, Michigan, for Appellees.

––––––––––––––

**OPINION**

––––––––––––––

SUHRHEINRICH, Circuit Judge.   Plaintiff Merrianne Weberg appeals the district court's entry of summary judgment in favor of defendant prison officials in this "reverse" racial discrimination action pursuant to 42 U.S.C. § 1983.[1]   For the reasons stated below, we **REVERSE**.

**I. BACKGROUND**

Plaintiff, a Caucasian corrections sergeant, was employed by the Michigan Department of Corrections ("MDOC") and stationed at the Western Wayne Correctional Facility ("WWCF").   WWCF houses primarily African-American inmates.  The staff is also predominately African-American. Defendant Kenny Robinson, the Warden, Defendant Randy Franks, the Personnel Director, Defendant Willis Chapman, an inspector, and Defendant Sharon Lauderdale, also a corrections sergeant, are all African-Americans.

The instant controversy evolved from a series of grievances Plaintiff filed asserting that Defendant Lauderdale was intentionally pursuing a racially-motivated confrontational course of conduct calculated to demean and humiliate her in the presence of both black and white corrections personnel and prisoners.  The first asserted incident occurred during roll call on February 7, 1996.  Plaintiff alleged that while she was

––––––––––––––

[1] Plaintiff also asserted the following causes of action under Michigan law: (1) violation of Article I, Section 2 of the Michigan Constitution; (2) violation of Michigan's Elliott-Larson Civil Rights Act; (3) violation of the Michigan Whistleblower's Act; (4) loss of consortium, society, and companionship; and (5) intentional interference with an advantageous business relationship.  Plaintiff has not pursued these issues on appeal.

Defendants Robinson, Franks, Chapman, and Lauderdale, and **REMAND** for further proceedings.

giving a speech seeking donations to benefit families of crime victims, Lauderdale ordered her staff to leave the meeting, thus creating an impression that the meeting had concluded. Plaintiff filed a grievance, but no hearing was held.

On February 17, 1996, Plaintiff and another Caucasian coworker, upon encountering a bloody prisoner in housing unit 45, requested officer assistance by activating her "body alarm." Upon responding to the emergency, Lauderdale, contrary to standard operating emergency practices at the facility, rudely ordered Plaintiff to leave the area. Plaintiff filed another grievance against Lauderdale, which was also allegedly ignored.

On April 9, 1996, during a bi-racial board meeting arranged by Lauderdale's superior to "clear the air" between the two women, Lauderdale, after exhibiting open hostility toward Plaintiff and characterizing the gathering as "some kind of Klan meeting," aborted the conference and abruptly left the room. Plaintiff filed another grievance against Lauderdale, which was disregarded.

Ten days after the aborted "clear the air meeting," Plaintiff and two Caucasian corrections officers, Kevin Wayne Hammermeister and Bryan Tyitye, were conducting a routine security check within housing unit 43. As they exited the unit's day room, someone from inside shouted a female-specific, obscene insult. Upon turning, the officers observed Ricardo Darnell Massenburg peering at them through a glass window. The officers reentered the day room. Hammermeister asked Massenburg for his prison identification card. Massenburg refused and began swearing at Hammermeister. Plaintiff instructed Hammermeister and Tyitye to handcuff the prisoner. Massenburg swung at Hammermeister and grabbed him around the waist. At this time, Plaintiff called for assistance. Massenburg was ultimately restrained by Hammermeister and Tyitye. After Hammermeister and Tyitye subdued Massenburg, Officer Wensko, who had come to assist, escorted Massenburg to temporary segregation. Massenburg was later escorted to

health services for medical attention for small scratches to his forehead and right wrist.

Of the various prisoners and security personnel who had been attracted to the commotion, including Lauderdale, no one reported observing Plaintiff, Hammermeister, or Tyitye kicking the prisoner in the head or any other body part.

Within a half hour of the incident, a routine investigation was conducted by Sgt. Hackworth, who filed the following Critical Incident Report:

At approximately 2145 hrs., prisoner Massenburg #160591-3-A-19L refused to present his I.D. card to officer Hammermeister by becoming very aggressive by making statements like: "fuck you", "I ain't giving you shit", and other profanities. Prisoner was ordered to put his hands behind his back so he could be handcuffed, prisoner resisted by pulling his arm away and swinging his fist at Officer Hammermeister. At this time Sgt. Weberg called "Officer Needs Assistance" in housing Unit #43. Officer Hammermeister was assaulted when prisoner Massenburg grabbed him around the waist during his resistance to being cuffed. Prisoner was then restrained by Officers Tyitye and Hammermeister with appropriate force. Prisoner was escorted to T/SEG [temporary segregation] at approximately 2150 hrs. by RUO Wensko, where he was placed in T/SEG 01 without further incident. Prisoner Massenburg was escorted to Health Services by C/S Gehoski and Reimann for medical attention for small scratches to forehead and rt. wrist. At 2155 hrs., Sgt. Huggins of MSP was notified of aforementioned incident. Officer Hammermeister declined to press assault charges. Universal precaution was used by all staff involved.

Three days later, on April 22, 1996, Massenburg filed a "Complaint Against Employee." The complaint is signed by "Acting ADW Chapman." In that document Defendant Chapman reported that "prisoner Massenburg alleges that Officer's [sic] Hammermeister, and Tyitye, and Sgt. Weberg

administrative complaint against her. Most significantly, Lauderdale faxed her incident report directly to Chapman, after-hours, on the night Lauderdale filed her administrative complaint. Lauderdale's unusual behavior, and Chapman's efforts to uphold Lauderdale's version of the event despite strong conflicting evidence, suggests a link between the two to further their common objective of discriminating against white correction officers. "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . circumstantial evidence may provide adequate proof of conspiracy." *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir. 1984) (internal quotations and citation omitted). Although only two of the four alleged conspirators in this case made openly racist comments, it is clear that all four shared in the general conspiratorial objective of using the Massenburg incident to sabotage Plaintiff's career at MDOC. Given Franks's deceptive, and Chapman's obfuscatory, efforts to achieve this goal, we think the openly racial motives of Robinson and Lauderdale can be imputed to Franks and Chapman. We hold that, with the foregoing evidence, Plaintiff raised an issue of fact to support her claim that Defendants conspired against her because she is white. The district court erred in holding otherwise.

### C. Disparate Impact

Plaintiff also claims that the district court erred in refusing to address her race discrimination claim based upon a disparate impact theory. As the district court held, mere disparate impact is not sufficient to state an equal protection claim under § 1983. *See Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir.1995); *see also Davis,* 426 U.S. at 244-45. This contention is without merit.

### IV. CONCLUSION

We **AFFIRM** the district court's grant of summary judgment on Plaintiff's disparate impact claim. We **REVERSE** the district court's grant of summary judgment to

Chapman referenced a statement Ozor gave him on April 30, 1996, that he, Ozor, had seen Plaintiff kick Massenburg once in the head. Again, Chapman was not deterred by the omission of said fact in Ozor's April 22 report or the lack of corroboration by any other officers at the scene. Although Chapman could have verified exactly what happened in the day room because he was charged with the custody of the audio recordings and visual tapes, he could not account for their whereabouts.

Chapman's conduct appears linked to Robinson's discriminatory decision. Robinson himself provided that link in his June 7, 1996, memorandum. In the memorandum, Robinson chastises Benedict for "undermin[ing] the investigation of the Inspector [Chapman]," despite Benedict's well-reasoned and well-supported criticism of Chapman's findings. In short, we think a common objective – discrimination against white personnel – can be inferred. Chapman's mutual intent to share in Lauderdale's discriminatory motives is revealed by his response to the various complaints and his efforts to distort the truth regarding the Massenburg incident.

### 3. Lauderdale

Lauderdale's conduct towards Plaintiff also appears to be based on an anti-white animus, not simply a personality conflict with Plaintiff. Plaintiff attested that, at the April 9, 1996 meeting Lauderdale remarked that it was "some kind of Klan meeting," and commented that "I ain't no mule for the man." Regarding the mule statement, Lauderdale denied making the comment in her answers to interrogatories, but in her deposition acknowledged a statement regarding mules, which she explained was merely a fable.

Lauderdale's link to the instant conspiracy is most clearly revealed by the timing and content of her Incident Report regarding the Massenburg incident. Although the altercation with the prisoner occurred on April 19, Lauderdale did not file her report until April 25. More significantly, Lauderdale did not file her report until Plaintiff filed a formal

were verbally and physically abusive during the [April 19, 1996] incident." Significantly, Chapman did not report any allegation by Massenburg that Plaintiff kicked him in the head.

Also on April 22, Officer Ignatius Ozor, an African-American, reported his observations of the Massenburg incident of April 19, 1996:

At approximately 2100 hrs, they [sic] yard crew, headed by Sgt. Weberg came to the Unit (43) for their normal routine shakedown. About 2140 hrs, the sergent [sic] requested for officer's assistance via radio transmission in the unit day room. I looked around and saw prisoners looking at the unit library room. As I rushed in, I observed Mastenburg [sic] on the floor resisting to be handcuffed – by Officers Hammermeister and Tyite [sic]. He was finally handcuffed and dragged up from the ground. I noticed some blood on his forehead before he was finally taken to segregation unit.

On April 25, 1996, Plaintiff filed a formal administrative complaint against Lauderdale, citing to the racially-motivated confrontations and harassment that occurred on February 7 and 17, and April 19, 1996, all of which she asserted was intended to humiliate, disparage, and discredit her in the presence of prisoners and security employees.

That night, Lauderdale faxed a four-page letter directly to Chapman from a Kinko's Reproduction Center. In her deposition, Lauderdale identified Deposition Exhibit 28 as the document she faxed. Exhibit 28 is an Incident Report dated April 25, 1996, in which Lauderdale recounts her version of the April 19, 1996 incident. In the report, Lauderdale stated that she heard a radio transmission calling for officer assistance in Unit # 43. As she entered the area where the altercation was taking place, Lauderdale claimed that she observed Massenburg on the floor. According to Lauderdale, Massenburg was laying flat on his stomach with his arms pinned underneath him. She stated that Hammermeister was restraining Massenburg on the left side of his body, while

Tyitye was restraining Massenburg on the right side. Lauderdale alleged that Plaintiff was standing and had her right foot pressed down on Massenburg's left foot. Lauderdale further stated that once Massenburg was handcuffed and brought to his feet, she observed that he was bleeding from his forehead. According to Lauderdale, as soon as Massenburg stood on his feet, he looked at Plaintiff and shouted, "You red head [sic] bitch, why did you wait until they cuffed me to kick me." Lauderdale alleged that Massenburg and Plaintiff began to exchange profanities at that point. Lauderdale also stated that Wensko, Hammermeister, and Tyitye escorted Massenburg to temporary segregation.

On April 26, 1996, with little to no preliminary investigation of his own, Chapman requested an immediate criminal investigation of the Massenburg incident by the State Highway Patrol.

On May 14, 1996, Chapman sent Deputy Warden Meader a memorandum recommending that a disciplinary conference be scheduled to address the allegations against Plaintiff. In his memorandum, Chapman reported that, based on his investigation, Plaintiff violated four MDOC Departmental Work Rules during the altercation involving Massenburg. First, Chapman found that Plaintiff used excessive force in restraining Massenburg, in violation of MDOC Departmental Work Rule IV, #11. He cited statements made by Lauderdale and Officer Tippins that Plaintiff stood on Massenburg's leg and foot and a statement of Officer Ozor that Plaintiff kicked Massenburg in the head. Chapman reported that during an interview of Ozor, Ozor stated that "while prisoner (Massenburg) was on the floor still resisting to being cuffed, *he was kicked around repeatedly by Sgt. Weberg, including one on his head.*" (Emphasis in original.) Ozor's April 22 written statement did not include any allegation of kicking. Chapman also noted that Plaintiff failed to report a full description of all the methods of restraint she used and all the statements she directed toward Massenburg, including any profanities.

Finally, Franks acknowledged that Robinson discussed the matter with him, although not in depth.

From Franks' abnormal and deceitful interjection into Benedict's investigation, we think it can be inferred that Franks shared the anti-white animus of Robinson, with whom he admittedly discussed the matter. Although circumstantial, we think the foregoing evidence supports Plaintiff's claim that Franks conspired with Robinson to take adverse action against Plaintiff because she is White.

### 2. Chapman

Plaintiff also introduced circumstantial evidence that Chapman acted based on discriminatory motives. Chapman investigated Plaintiff's complaint regarding the February 17, 1996 incident. Despite his awareness of animosity between Plaintiff and Lauderdale and the statements of three officers, C/O Stewart, C/O Mcalister, and Lt. Allen, supporting Plaintiff's view that Lauderdale's conduct was intentional, Chapman testified that he found insufficient evidence to support a conclusion that Lauderdale intentionally interrupted Plaintiff during roll call.

By contrast, Chapman's investigation of the Massenburg incident kicked into high gear the morning after Lauderdale faxed her critical incident report. On that day, April 26, 1996, Chapman contacted the Michigan State Police to conduct a criminal investigation. He did so, however, before conducting an internal investigation of his own and in the face of conflicting reports. Two of those reports were directly antagonistic – Plaintiff's and Lauderdale's. Further, the most critical document, the prisoner's own statement, *which Chapman himself transcribed*, makes no mention of any kick to the head. Only Lauderdale's report indicated that Plaintiff had kicked Massenburg.

In his May 14, 1996 report to Deputy Warden Meader, Chapman concluded that "Prisoner Massenburg's allegation of inhumane treatment and excessive force by Sgt. Weberg is supported by believable witnesses' evidence." In support,

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985) (citations omitted); *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987) (stating that conspiracy claims under § 1983 must be pled with some degree of specificity).

### 1. Franks

Franks acknowledged in his deposition testimony that the Personnel Director is not involved in the disciplinary process. Franks also verified that after a disciplinary hearing, a recommendation is made to the Warden. Despite his lack of a role in the process, Franks admittedly interceded in Benedict's investigation, knowing Benedict would make a recommendation to Robinson. Although Franks explained that he did so because other employees were worried that the matter would be swept under the rug, he could not identify the employees who expressed that concern. Most tellingly, Franks apparently lied in a recorded message to Benedict about a conversation with Janice Jennings in Labor Relations, in his efforts to improperly influence Benedict's decision.

---

personal knowledge. *See* Fed. R. Civ. P. 56(e) (affidavits opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). We have had to disregard many of Plaintiff's allegations because they were not made with Plaintiff's personal knowledge, or were otherwise based on hearsay. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).

Second, Chapman found that Plaintiff directed offensive, abusive, and profane language toward Massenburg during the altercation, in violation of MDOC Departmental Work Rule IV, #9B. Third, Chapman found that Plaintiff failed to take proper security precautions during the incident, in violation of MDOC Departmental Work Rule IV, #16. He noted that Plaintiff ignored departmental policy of prohibiting an officer to be present or participate in restraining a prisoner if he had just been assaulted by the prisoner. He stated that Plaintiff, by permitting Hammermeister to bring Massenburg to administrative segregation, "created the appearance of reprisal."

Finally, Chapman found that Plaintiff failed to make required reports, in violation of MDOC Departmental Work Rule IV, #17. Specifically, Chapman indicated that in her critical incident report for the April 19, 1996 incident, Plaintiff failed to report that Massenburg surrendered his prisoner I.D. card to Tyitye. Chapman also stated that Plaintiff appeared to alter her story because in a statement given on April 30, 1996, Plaintiff stated for the first time that the prisoner "jumped from his chair," and asserted a "defensive posture." Chapman opined that "[t]here is definite reason to believe that Sgt. Weberg's initial report was incomplete or the change is an attempt to portray Prisoner Massenburg as agitated, angry, and threatening toward staff." Plaintiff was given notice of the charges against her on May 23, 1996, and a disciplinary conference was scheduled for June 4, 1996.[2]

Although the Personnel Director was not normally involved in the grievance process, Defendant Franks called Assistant Deputy Warden Benedict, the person assigned to conduct Plaintiff's disciplinary hearing, prior to the proceeding. Franks recommended to Benedict that Plaintiff be terminated. Franks stated that he made the recommendation because he knew that Benedict and Plaintiff were good friends, "and I also knew concerns expressed by employees that action might

---

[2]Plaintiff was not charged with failing to make required reports.

be taken that might not be in line with departmental procedures in conducting or making recommendations for disciplinary action." Franks could not identify any of these employees, however.

Franks also stated that prior to calling Benedict, he discussed the matter with Labor Relations in Lansing. In his deposition testimony Franks testified that:

A. [ ] I initially discussed it with Labor Relations in Lansing and they gave me parameters on which they made decisions in other cases involving the use of force, and I relayed that to Mr. Benedict.

Q. What did you relay to Mr. Benedict?

A. That in prior occasions involving the use of force the individual was dismissed.

In a tape-recorded telephonic message to Benedict before Plaintiff's hearing, Franks stated:

This is Randy. I spoke with Labor Relations and they indicated that we are to recommend dismissal on the charges against Ms. Weberg as the reasoning for not bringing her back to work. If you have any questions, give me a call.

In direct contradiction to Franks' testimony, Janice Jennings of the Labor Relations Board testified in her deposition that she never told Franks that Plaintiff should be terminated. Jennings also stated that it would be irregular and against departmental policy to discuss the Massenburg incident with Franks.

On May 29, 1996, the Michigan State Police closed its investigation. Detective Gary Gray, who was assigned the case, concluded that there was insufficient evidence to support a prosecution because "[t]here was no indication from any of the witnesses that excessive force exhibited to such an extent to inflict physical injury to the prisoner was ever used."

presented. As Franks outlined in his deposition testimony, it was standard procedure for a disciplinary hearing to be conducted after an initial investigation was completed, and prior to a recommendation being made to the Warden. We are also at a loss to understand why it was improper for Benedict, as factfinder, to consider other information relevant to the investigation. Robinson's total disregard of the conflicting evidence and spurious attack on Benedict cast doubt on Robinson's explanation. Robinson's written statement and deposition testimony suggest that race was the real reason behind his actions toward Plaintiff.

In sum, we hold that Robinson's statements provide direct evidence of racial discrimination, thereby creating a genuine issue of material fact. The district court erred in granting summary judgment to Robinson. Having met her summary judgment burden with direct evidence of discrimination by Robinson, we need not consider whether there is also circumstantial evidence of Robinson's discriminatory animus.

### B. Conspiracy

Although there is no direct evidence that the remaining three Defendants – Franks, Chapman, and Lauderdale – discriminated against Plaintiff because she is white, Plaintiff has alleged[12] and offered evidence to establish that these three defendants conspired with Robinson to deprive Plaintiff of equal protection of the laws because she is white and they are black.[13]

---

[12]In her First Amended Complaint, Plaintiff alleged that the actions described in the complaint "were part of a custom[,] policy[,] procedure[,] or practice of the Western Wayne Correctional Facility and were either condoned by, authorized by, or acquiesced to by Defendants, jointly and severally."

[13]In support of her burden under Fed. R. Civ. P. 56, Plaintiff relies on numerous allegations in her verified complaint. Although statements in a verified complaint may function as the equivalent of affidavit statements for purposes of summary judgment, *see William v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992), affidavit statements must be based on

Holding a prisoner[']s legs down to prevent him from striking staff is not an example of excessive use of force. I move to dismiss the charge of excessive use of force.

Robinson disregarded Benedict's detailed findings and made no attempt to resolve the glaring contradictions in the evidence himself.[11]    Rather, Robinson simply faulted Benedict for "undermin[ing] the investigation of the inspector, question[ing] the credibility of staff and tak[ing] the word of an [sic] prisoner (Bailey) who is not housed in the unit [where] the incident took place."

We find it odd that a person conducting a disciplinary hearing, charged with the duty of determining whether sufficient evidence exists to support the charges, errs when he engages in an independent evaluation of the evidence

---

[11]Apparently, the district court did the same thing.  In accepting Defendants' articulated reason, and rejecting Plaintiff's proof of pretext (under the burden-shifting analysis) the court held:

> Warden Robinson did not agree with ADW P. Benedict's recommendation dated June 5, 1996, finding that the excessive force and failure to take proper precaution charges were not substantiated. . . . The exhibits submitted by Plaintiff show that Plaintiff Weberg may have kicked Prisoner Ricardo Massenburg, an African American, while he was handcuffed and on the ground.  The April 19, 1996, incident report and April 22, 1996, statement submitted by Prisoner Massenburg indicate he was kicked by Plaintiff Weberg. . . . RUO D. Ozor's April 22, 1996, memorandum to Inspector Chapman and his responses to Inspector Chapman's inquiries about the incidents shows that Plaintiff Weberg kicked Prisoner Massenburg while he was on the ground. . . . An April 25, 1996, memorandum from Sergeant Sharon Lauderdale to Inspector Chapman and his responses to Inspector Chapman also indicates that Plaintiff kicked Prisoner Massenburg on the head while he was lying on the ground. . . . Inspector Chapman's report on the incident shows that he interviewed numerous prisoners and staff regarding the incident and concluded that Plaintiff Weberg kicked Prisoner Massenburg while he was on the ground.

The district court's finding that the April 19, 1996 incident report and April 22, 1996 Ozor statement "indicate he [Massenburg] was kicked by Plaintiff Weberg" is not supported by the documentary evidence.

---

Gray stated that Ozor informed him that Plaintiff stood on Massenburg's legs and "then started to kick him while he was resisting."  He noted, however, that Ozor was unsure if the kick  to the head was in fact intentional or accidental.  Ozor told Gray that he did not think that Plaintiff intended to harm Massenburg, and that Plaintiff probably kicked Massenburg because he was struggling so violently.

On June 5, 1996, Benedict conducted a disciplinary hearing.  He sent Robinson a memorandum on that same day recommending that Plaintiff only be reprimanded for swearing at Massenburg.  He found that the allegations of Plaintiff kicking Massenburg were unsubstantiated.  He was suspicious of Ozor's statement that he observed the whole incident but never assisted.  Benedict noted that at least seven other corrections officers on the scene did not see Ozor in the area when the incident took place and that no other corrections officer saw Plaintiff kick Massenburg on the head.  He further noted that a "kite" received from a prisoner named Bailey stated that he had heard several inmates talking about false statements they had made about Plaintiff regarding the incident.  Additionally, Benedict stated that the small abrasion on Massenburg's right wrist and the small superficial scratch on his forehead were inconsistent with the use of excessive force.

Benedict also found that the charge of failing to take proper security precautions was unsubstantiated.  He stated that Plaintiff did not have time to defuse the situation, wait for the prisoner to cool down, or use de-escalation techniques.

On June 7, 1996, Robinson modified the discipline recommended by Benedict.  Reinstating the charges against Plaintiff, Robinson demoted and suspended Plaintiff.[3]  In the disciplinary report, Robinson stated:

---

[3]The actual suspension is inconsistent with Robinson's written report.

It appears that at the disciplinary [sic] the individual holding the conference took it upon himself to investigate the investigation of the Inspector. I find this totally unacceptable. When conducting a disciplinary conference the charge is to review the evidence presented and determine if they [sic] support the charges brought. If the investigation was not complete it should have been returned prior to holding the disciplinary conference. Here was a situation that should have, and could have been avoided by the supervisor present at the scene. I find it unacceptable for the ADW to undermine the investigation of the Inspector, question the credibility of staff and take the word of an [sic] prisoner (Bailey) who is not housed in the unit [where] the incident took place. The incident was totally mishandled by the supervisor at the scene. Procedures were not followed. This could have led to a serious outburst by the prisoners in the unit. And for us to try to cover up the mistakes is not proper. In reviewing the investigation there is no evidence the officers specifically saw prisoner Massenburg make the alledged [sic] comment. All three had their back to the Day room and were on their way out of the unit. *Here we have three white employees and one black inmate. The wrong message is thus sent to other inmates in the unit who are watching the incident.* I think other steps should have been taken to avoid this incident. As such I am reinstating the original charges and recommending Ms. Weberg be demoted and suspended for three days. (Emphasis added.)

Plaintiff was allowed to return to work in early August of 1996, but remained on medical leave. In her brief, Plaintiff states that the MDOC reduced the discipline imposed by Robinson to a fifteen-day suspension, but without a demotion. Plaintiff also states that she appealed the suspension to the Michigan Department of Civil Service, which, after a sixteen-month investigation, reduced the discipline to a written reprimand. According to Plaintiff, the Michigan Department of Civil Service concluded that she was not guilty of any wrongdoing other than directing profanity toward a prisoner.

In summary, ADW Benedict reported said that he had a problem with Ozor's statement, in which he stated that he observed the whole incident but he never assisted. C/O [Corrections Officer] Tippens claims in his report that he heard the call on the radio for assistance and was the first to arrive. He did not observe the prisoner being struck nor C/O Ozor in the area.

C/O Terry did not observe Ozor in the area. C/O Hold was told to clear the day room, and reported there were no other officer's [sic] in there, but there were three officers at the desk. C/O Hammermeister did not see Ozor. Sgt. Lauderdale claimed to be one of the first people to arrive. She said she saw Sgt. Weberg's foot pressed against the prisoner[']s foot, and did not observe Ozor to be in the area, nor Sgt. Weberg kicking the prisoner. C/O Terry did not see Ozor in the areas. C/O Murdoch did not see Ozor. C/O Rieman did not see Ozor. C/O's [sic] Stewart and Wensko helped cuff the prisoner, and did not observe any inappropriate behavior/actions on the part of Sgt. Weberg. Also, in all these statements, these staff did not witness any hitting or kicking of this prisoner by Sgt. Weberg. If indeed Ozor witnessed the incident from the officer[']s desk, the visibility from the desk to the card room would have been practically zero, especially with the table blocking the view. ADW Benedict also added to the evidence, a kite received by prisoner Bailey, #238168, stating that "He heard several inmates taking [sic] about false statements they made about Sgt. Weberg in Unit 43. That she really didn't do what they wrote in their statements, and that they were only trying to hook her up". Statement attached. RN Tate also reported that upon examination of prisoner Massenburg directly after the incident – small abrasion on right wrist, small superficial scratch on forehead; neither of which is consistent with excessive use of force.

Q.  Do you recommend termination every time an officer hits an inmate?

A.  No.

Q.  Well why not?

A.  Certain circumstances call for certain actions. (Emphasis added.)

In short, Robinson openly admitted that he would terminate an employee simply because of the "perceptions of inmates," and that he had in fact done just that.  He further indicated that he felt "strongly" that plaintiff should be terminated "[s]imply because she was white and she was in a black housing unit."

"[D]irect evidence is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor.  With direct evidence, the existence of unlawful discrimination is 'patent.'" *Bartlik v. United States Dep't of Labor*, 73 F.3d 100, 103 n. 5 (6th Cir. 1996) (internal quotation marks and citations omitted).  In other words, if believed, Robinson's statements lead to the conclusion that anti-white animus motivated the employment decision he made regarding Plaintiff.  *See id.; Jacklyn*, 176 F.3d at 926.  The foregoing statements easily satisfy this standard.

Robinson's proffered explanation for suspending Plaintiff, which the lower court credited, was that he believed that she kicked the inmate on the head and that he was concerned about race relations in the prison.[10]  That explanation is suspect, however.  First, it appears to have little basis in fact.  Benedict detailed in his report why Chapman's documentation did not support the charge:

---

[10]Because the district court employed the *McDonnell Douglas* burden-shifting analysis, it treated Defendants' explanation as merely a burden of production.  However, on remand, Defendants will bear the burden of persuasion on this point.

---

Plaintiff also states that after the investigation, she was given a "waived leave of rights"[4] by the MDOC, which she claims constructively discharged her and prevented her from going back to work as a Corrections Sergeant.

Plaintiff sued MDOC ,[5] Robinson, Franks, Chapman, and Lauderdale, alleging reverse race discrimination under 42 U.S.C. § 1983 and Michigan's Elliott-Larsen Civil Rights Act.  Plaintiff alleged that the described actions were part of a custom[,] policy[,] or practice of the Western Wayne Correctional Facility and were either condoned by, authorized by, or acquiesced to by Defendants "jointly and severally."  Defendants moved for summary judgment, which the district court granted on March 31, 1998.  The court noted that a section 1983 claim could not be based on a disparate impact analysis and, therefore, refused to consider Plaintiff's claim under this theory.  The district court then applied the four-part *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) test, noting that to prove an equal protection claim under section 1983 a plaintiff must establish the same elements required to establish a disparate treatment claim under Title VII.[6]  The court determined that Plaintiff failed to establish a prima facie case of racial discrimination because she failed to demonstrate that she was replaced while on suspension or that she was treated less favorably than similarly-situated African-American officers.

---

[4]Plaintiff does not explain the meaning of a "waived leave of rights."

[5]Plaintiff also named the State of Michigan and the Michigan Department of Corrections as defendants in this action.  However, on December 3, 1996, the parties stipulated to the withdrawal of the complaint against the State of Michigan and the Michigan Department of Corrections without prejudice.
On December 20, 1996, the district court dismissed Plaintiff's claims to the extent they were asserted against the individual defendants in their official capacities.

[6]The district court did not separately analyze Plaintiff's section 1983 claim with respect to each individual defendant.  Rather, the court conducted its analysis as if there were only one defendant.

The district court also ruled that, even assuming arguendo that Plaintiff had established a prima facie case, Defendants had proffered a legitimate, nondiscriminatory reason for her suspension — a belief that Plaintiff kicked an inmate and concern about race relations in the prison — and Plaintiff failed to demonstrate that Defendants' reasons were pretextual. The court also ruled that Plaintiff did not present direct evidence of racial discrimination.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *See Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We are required to view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party must set forth specific facts demonstrating that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. DISCUSSION

To state a claim under § 1983, a plaintiff must plead and prove that she has been deprived of a right secured by the Constitution or federal laws, by one acting under color of state law. *See* 42 U.S.C. § 1983; *Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984). To establish an equal protection claim against a public employer under § 1983, the "plaintiff must show that the employer made an adverse employment decision 'with discriminatory intent and purpose.'" *Boger v. Wayne County*, 950 F.2d 316, 324-25 (6th Cir. 1991) (quoting *Charles v. Baesler*, 910 F.2d 1349, 1356-57 (6th Cir. 1990)); *Gutzwiller v. Fenik*, 860 F.2d 1317,

A.   Conceivably, given the circumstances.

Q.   You would recommend terminating an employee because of the perceptions of inmates?

A.   Conceivably, yes.

Q.   That's exactly what you did, didn't you?

A.   Yes.

Q.   *So you would recommend terminating a white employee for doing nothing wrong except conceivably giving the wrong impression to black inmates? Isn't that what you just said?*

A.   That's what your offering, but it's not that simple to me.

Q.   Isn't that what you just said?

A.   *Yes.*

Robinson further testified:

Q.   Why did you feel so strongly that Plaintiff should be terminated?

A.   Only based on the setting. That's the only reason.

Q.   *Simply because she was white and she was in a black housing unit?*

A.   *Yes.*

Q.   So if she had done the same activity, kicked an inmate, and it was in a white housing unit you probably would not have recommended a termination?

A.   Yes, I would have, because prisoners react regardless of being black or white.

Warden Robinson's notation of Plaintiff's race in the Disciplinary Report does not show that he suspended Plaintiff because of her race. As indicated above, Warden Robinson's reason for noting Plaintiff's race and the prisoner's race in the report was because of "the volatility of the housing unit and a black male prisoner" . . . and to keep the situation from becoming "a serious outburst by the prisoners in the unit." . . . Warden Robinson's main concern was to keep peace and discipline in the housing unit and not to arouse the prisoners to riot.

Unlike the district court, we think Robinson's "main concern" was race. In his June 7, 1996 memorandum, Robinson wrote: "Here we have three white employees and one black inmate. The wrong message is thus sent to other inmates in the unit who are watching the incident." Robinson reiterated the sentiment in his deposition testimony:

Q. . . . The statement here, we have three white employees and one black inmate. What does that have to do with anything regarding this situation?

A. Considering the volativity [sic] of the housing unit and a black male prisoner.

Q. Why does that have to be put into a disciplinary issue? Is there something wrong with three white officers dealing with a black inmate?

A. No.

Q. What does that have to do with anything then?

A. The perception of the prisoners in the housing unit.

Q. So the perception of the prisoners in the housing unit influences you in how you're going to discipline somebody for not even doing what you think that person did?

1325 (6th Cir. 1988) (the plaintiff must prove by a preponderance of the evidence that she was the victim of "intentional and purposeful discrimination"); *see also Washington v. Davis*, 426 U.S. 229, 239-42 (1976) (holding that in order to prove an equal protection violation, the plaintiff must demonstrate that the defendant acted with discriminatory intent); *see generally Annis v. County of Westchester*, 36 F.3d 251, 254-55 (2d Cir. 1994) (observing that every circuit to have addressed the issue, including the Sixth Circuit, has held that Title VII is not the exclusive remedy for discrimination against state employers when those claims derive from violation of constitutional rights). The plaintiff may not simply introduce evidence of discriminatory intent and suggest that "'such intent could have played a role in an adverse employment decision. Rather, a plaintiff is required to demonstrate that the adverse employment decision would not have been made "but for" her [race].'" *Boger*, 950 F.2d at 325 (quoting *Gutzwiller*, 860 F.2d at 1325).

Plaintiff claims race discrimination in violation of § 1983 under both disparate treatment and disparate impact theories. Plaintiff also alleges that Defendants conspired to violate her constitutional rights.

### A. Disparate Treatment

Because both Title VII and § 1983 prohibit discriminatory employment practices by public employers[7], this court looks to Title VII disparate treatment cases for assistance in analyzing race discrimination in the public employment context under § 1983. *See, e.g., Gutzwiller*, 860 F.2d at 1325; *Kitchen v. Chippewa Valley Schs*, 825 F.2d 1004, 1011 (6th Cir. 1987); *Daniels v. Board of Educ.*, 805 F.2d 203, 206-07 (6th Cir. 1986); *Grano v. Department of Dev.*, 637 F.2d 1073, 1081-82 (6th Cir. 1980).

---

[7]This circuit holds that an individual employee/supervisor who does not otherwise qualify as an "employer" may not be sued under Title VII. *See Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). Individual liability is allowed under § 1983, however.

The plaintiff can make the required showing by demonstrating that race was a direct factor in the employment decision. *See Abeita v. Transamerica Mailings, Inc.*, 159 F.2d 246, 252-53 (6th Cir. 1998); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997); *see generally Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). The burden of persuasion then shifts to the defendant to show that it would have terminated the plaintiff's employment absent the discriminatory motive. *See id.* (citing *Price Waterhouse*, 490 U.S. at 244-45). *See also Terbovitz v. Fiscal Court of Adair Cty.*, 825 F.2d 111, 115 (6th Cir. 1987) (noting that once the district court accepts the plaintiff's direct evidence, the employer's asserted nondiscriminatory reason, which is merely a burden of production under the *McDonnell Douglas* framework, essentially becomes an affirmative defense upon which the employer bears the burden of proof).

Alternatively, the plaintiff can meet her evidentiary burden through indirect evidence under the *McDonnell Douglas* framework. *See Buntin v. Breathitt County Board of Educ.*, 134 F.3d 796, 800 (6th Cir. 1998) ("Evaluation of Buntin's discrimination claims under Title VII [and] 42 U.S.C. § 1983 . . . follow the Title VII framework set forth by the Supreme Court in *McDonnell Douglas* . . . ."); *see generally Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2106 (2000) (stating that *McDonnell Douglas* and progeny have "'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases;'" quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)).[8] The direct evidence and

---

[8] Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of racial discrimination. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1972). When a plaintiff claims "reverse discrimination," "the presumption that the

circumstantial evidence paths are mutually exclusive; the plaintiff can meet her burden with either method of proof. *See Johnson v. University of Cincinnati*, 215 F.3d.561, --, No. 98-3016, 2000 WL 726528, at *7 (6th Cir. June 1, 2000).[9]

We believe this to be one of those "rare" cases where there is "direct evidence from the lips of the defendant proclaiming his . . . racial animus." *Robinson v. Runyan*, 149 F.3d 507, 513 (6th Cir. 1998).

### 1. Robinson

In holding that Plaintiff failed to submit direct evidence of discrimination, the district court reasoned that

---

circumstances which normally make out a prima facie case are indicative of discrimination is not available, absent a showing that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Boger,* 950 F.2d at 3225 (internal quotations omitted). This court has also cited a second factor in the Title VII context: The plaintiff must also demonstrate that the employer treated differently similarly situated employees outside the protected class. *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 (6th Cir. 1994). *But see id.* at 801 n.7 (criticizing this test, because the first prong imposes "a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts"); *see also Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 n.2 (7th Cir. 1999) (noting that Sixth Circuit "reverse discrimination" prima facie test is "the subject of intra-circuit controversy"); *see generally id.* at 454-56.

The district court in this case erred in applying the prima facie test for traditional Title VII claims instead of the modified prima facie test set forth in *Boger* and *Pierce.*

[9] The litigants concurred, and the district court accordingly found, that Weberg, as a Caucasian employee in a workplace predominantly staffed and managed by African-Americans, was a member of a protected racial minority group. Thus, the parties have agreed that the requirements of *Boger*, 950 F.3d at 324-25 have been satisfied, and Weberg was a member of a protected class who claimed to have been the victim of intentional racial discrimination that ultimately resulted in an adverse employment decision.