NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0436n.06
No. 18-5862

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 20, 2019
DEBORAH S. HUNT, Clerk

DAVID LYNN CROWLEY,              )
    **Plaintiff-Appellee,**       )
                                  )
v.                               )
                                  )
ANDERSON COUNTY, TENNESSEE; N. JAY )   ON APPEAL FROM THE
YEAGER,                          )   UNITED STATES DISTRICT
                                  )   COURT FOR THE EASTERN
    **Defendants-Appellants,**    )   DISTRICT OF TENNESSEE
                                  )
WILLIAM ANDREW CORBITT,          )
    **Defendant**.                )   **OPINION**
                                  )

Before: MOORE, COOK, and READLER, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** David Crowley was the Building Commissioner for Anderson County, Tennessee, and he performed five building inspections without certain certifications that are required by state law. These inspections led to legal trouble: Anderson County's Law Director, N. Jay Yeager, authored a memo discussing Crowley's apparent violations of state law, and Yeager referred the matter to the District Attorney; the District Attorney and the Tennessee Bureau of Investigation ("TBI") then initiated their own five-month investigation; eventually, the District Attorney prosecuted Crowley. A jury acquitted Crowley. Understandably unhappy with what he endured, Crowley sued under 42 U.S.C. § 1983, alleging various violations of his civil rights. The question presented here is whether Yeager is entitled to qualified immunity. We **REVERSE** the district court because Yeager is entitled to qualified

immunity on the civil-rights-conspiracy claim, and this also absolves Anderson County of liability on that claim. We also **REMAND** this case for further proceedings consistent with this opinion.

## I. BACKGROUND

In September 2012, David Crowley was appointed by the mayor and confirmed by the County Commission to serve as the County's Building Commissioner and Director of Public Works. In this role, Crowley oversaw building inspectors and the building-permitting process, and he signed off on any building-code violations. *See* R. 83-1 (Crowley Dep. at 14) (Page ID #1244). When he was first appointed, Crowley was not a certified building inspector, but he learned of that certification requirement at some point after entering his role as Building Commissioner. *Id.* at 16–17, 38 (Page ID #1246–47, 1264); *see also id.* at 41–42 (Page ID #1267–68) (the mayor wrote a letter to the state fire marshal indicating that Crowley failed one of the certification exams on November 18, 2013). Crowley could not recall exactly when he received his certification, but he testified that he probably received it in 2014. *See id.* at 18 (Page ID #1248).

In Tennessee, all municipal and county building officials must "receive certification from the state fire marshal before enforcing applicable building and fire codes." TENN. CODE ANN. § 68-120-113(a)(1). State law provides that building officials "shall have up to twelve (12) months *from the date of employment* to receive certification." *Id.* (emphasis added). State law further provides that a "building official who knowingly fails to enforce this [statute], and such intentional failure poses an immediate danger to the life, safety or welfare of another, commits a Class B misdemeanor." *Id.* at § 68-120-113(d)(2).

Crowley did not receive his certification within twelve months from the date he entered his employment, and he performed building inspections after that time. The inspections occurred between October 2013 and December 2013. R. 83-1 (Yeager Memo at 2) (Page ID #1576).

Crowley admits that he performed these inspections. R. 83-1 (Crowley Dep. at 82–84 (Page ID #1294–96). Crowley also testified that he stopped performing building inspections in January 2014, after receiving a notice from a state agency that he was not certified. *Id.* at 39–41 (Page ID #1265–67).

In January 2014, N. Jay Yeager, the County's Law Director, wrote a memo that outlined the five inspections, and he presented the memo to the County Commission at a meeting that same month. *See* R. 83-1 (Yeager Memo at 2) (Page ID #1576). Before writing the memo, Yeager informed Crowley that Yeager would need to investigate this matter. R. 83-1 (Crowley Dep. at 56–57) (Page ID #1277–78). Yeager initially learned of the five inspections from several individuals, some of whom were building inspectors. *See* R. 83-1 (Yeager Dep. at 67–70) (Page ID #1490–93). Yeager also called the state fire marshal, described the situation to an individual in that office, and that individual indicated the inspections violated the law; Yeager then asked to be transferred to and spoke to the fire marshal's legal counsel, who confirmed the view that the inspections ran afoul of the statute. *Id.* at 158–59 (Page ID #1526–27). The Yeager memo stated that "[e]ach of these inspections . . . can possibly be prosecuted as Class B misdemeanors." R. 83-1 (Yeager Memo at 2) (Page ID #1576). It continued:

> these are allegations at this point and I will need to do a complete investigation of the matter to confirm the allegations. I need directions from County Commission to proceed with a full investigation of this matter . . . . Furthermore, I have no choice but to refer any possible criminal violations to the District Attorney General if the investigation reveals possible criminal acts.

*Id.*

At his deposition, though, Yeager testified that his office does not "do the investigation of criminal acts," and that his department does not "have any jurisdiction to investigate criminal allegations." R. 83-1 (Yeager Dep. at 106) (Page ID #1505). Rather, Yeager turns over potentially

criminal matters to the district attorney or local law enforcement. *See id.* In this case, after sending his memo to the District Attorney, David Clark, Yeager testified that he did nothing else in the case. *See id.* at 106–07, 151 (Page ID #1505–06, 1520). DA Clark testified that he and Yeager had a very brief meeting in April, at which Yeager gave him the memo. R. 83-1 (Clark Dep. at 41) (Page ID #1437); *see also id.* at 43 (Page ID #1439) (DA Clark does not "recall speaking to Mr. Yeager about the Crowley investigation after it was referred to the TBI."). DA Clark then requested TBI Agent William Corbitt to investigate, and Agent Corbitt initiated his own five-month investigation. Agent Corbitt did request to interview Yeager at the end of his investigation, in September 2014. At the interview, Agent Corbitt asked Yeager about his memo and how he obtained the information in the memo. *See* R. 83-1 (Corbitt Dep. at 89–90) (Page ID #1336–37). DA Clark, meanwhile, testified that Yeager played no role in how the investigation or prosecution of Crowley was performed. *See* R. 83-1 (Clark Dep. at 89) (Page ID #1456).

At the end of the TBI investigation, Agent Corbitt issued a report. *See* R. 83-1 (TBI Rep. at 1) (Page ID #1606). Although Agent Corbitt believed that Crowley's inspections "affected the welfare of another at the moment [Crowley] did that inspection outside of that grace period," R. 83-1 (Corbitt Dep. at 84–95) (Page ID #1340–41), the report does not specifically indicate that Crowley's inspections posed an immediate danger to the safety or welfare of others, *see* R. 83-1 (TBI Rep. at 1–4) (Page ID #1606–09); TENN. CODE ANN. § 68-120-113(d)(2).

Nonetheless, DA Clark made the decision to present Crowley's case to the grand jury. R. 83-1 (Clark Dep. at 55) (Page ID #1444). The grand jury issued an indictment, and the case eventually went to trial. Yeager did not testify at the grand jury, but he did testify at trial. R. 83-1 (Yeager Dep. at 156) (Page ID #1524). Crowley's criminal trial lasted two days, April 26 and 27, 2016. The jury acquitted Crowley on all charges.

One year later, Crowley sued Anderson County, Yeager, and Corbitt for malicious prosecution, § 1983 civil-rights conspiracy, conspiracy to render false testimony, as well as other claims not relevant here. On the malicious-prosecution claim, the district court granted Yeager's motion for summary judgment, but the district court denied qualified immunity to Corbitt and allowed this claim to proceed against Corbitt alone. *See* R. 107 (Dist. Ct. Op. at 7–16) (Page ID #3366–75). The district court did not, however, address Yeager's qualified immunity on the civil-rights-conspiracy claim. Instead, the district court reasoned that "[b]ecause Plaintiff's claim for *malicious prosecution* against *Corbitt* survives summary judgment," Crowley could survive summary judgment on the *civil-rights-conspiracy* claim against *Yeager*. *See id.* at 20 (Page ID #3379) (emphasis added). (In his summary-judgment brief, Yeager dedicated five pages to qualified immunity. *See* R. 85 (Mot. for Summ. J. at 19–23) (Page ID #1687–91).) Oddly, Yeager did not move for summary judgment on the claim of conspiracy to render false testimony. Lastly, the district court, though skeptical of the strength of the claim, denied the defendants' summary-judgment motion on Crowley's claim for punitive damages. *See* R. 107 (Dist. Ct. Op. at 22–23) (Page ID #3381–82) (describing this claim as "less than overwhelming").

## II. JURISDICTION

Before turning to the merits, we must address our jurisdiction. Of course, "it is well-established that an order denying qualified immunity to a public official is immediately appealable pursuant to the 'collateral order' doctrine to the extent that a summary judgment order denies qualified immunity based on a pure issue of law." *See Bennett v. Krakowski*, 671 F.3d 553, 558–59 (6th Cir. 2011) (citations and internal quotation marks omitted); *Turner v. Scott*, 119 F.3d 425, 427 (6th Cir. 1997) ("A denial of qualified immunity that turns on evidentiary issues is not

5

[immediately appealable].").  The wrinkle here is that the district court did not address Yeager's qualified-immunity defense.

The district court's failure to address qualified immunity does not deprive us of jurisdiction over Yeager's appeal.  "This court 'has held on multiple prior occasions that, when faced with a motion based on qualified immunity, a district court can not avoid ruling on the issue.'" *Everson v. Leis*, 556 F.3d 484, 492 (6th Cir. 2009) (quoting *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004)).  In turn, "the district court's refusal to address the merits of the defendant's motion asserting qualified immunity constitutes a conclusive determination for the purposes of allowing an interlocutory appeal." *Summers*, 368 F.3d at 887.

Whether we have jurisdiction over Anderson County's appeal raises a separate question of pendent appellate jurisdiction.  Under the doctrine of pendent appellate jurisdiction, we may, in our discretion, exercise jurisdiction over issues that are "inextricably intertwined" with ones over which we independently have jurisdiction.  *See Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998).  Anderson County cannot claim qualified immunity, and therefore issues related to the County are not immediately appealable.  But sometimes "the issues of liability and qualified immunity are so related to each other that we can dispose of them together under the doctrine of pendent appellate jurisdiction." *See Brennan v. Township of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996).

As all sides acknowledge, the case against Anderson County rises and falls with the case against Yeager.  If Yeager is entitled to qualified immunity because he did not violate Crowley's constitutional rights, then the County cannot be held liable either. *See Mattox v. City of Forest Park*, 183 F.3d 515, 523 (6th Cir. 1999) ("If the plaintiffs have failed to state a claim for violation of a constitutional right at all, then the City of Forest Park cannot be held liable for violating that

right any more than the individual defendants can."); *see also Meals v. City of Memphis*, 493 F.3d 720, 727 (6th Cir. 2007). Consequently, we have jurisdiction over claims against Anderson County to the extent that those claims can be disposed with the immediately appealable issue of qualified immunity.

### III. QUALIFIED IMMUNITY

Government officials are entitled to qualified immunity from suits for civil damages if their conduct "do[es] not violate clearly established law of which a reasonable person would have known." *See Berkshire v. Beauvais*, 928 F.3d 520, 529 (6th Cir. 2019) (quoting *Comstock v. McCrary*, 273 F.3d 693, 701 (6th Cir. 2001)). The problem for Crowley at summary judgment is that he cannot point to evidence that shows there is more than "some metaphysical doubt as to the material facts." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002). Thus, Crowley has not made a sufficient showing of a legal violation, which means Yeager should receive qualified immunity on the civil-rights-conspiracy claim.

"A civil conspiracy under § 1983 is 'an agreement between two or more persons to injure another by unlawful action.'" *See Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). In *Bazzi*, we outlined the elements of this claim as follows:

> To prevail on a civil conspiracy claim, [a plaintiff] must show that (1) a "single plan" existed, (2) [the defendant] "shared in the general conspiratorial objective" to deprive [the plaintiff] of his constitutional (or federal statutory) rights, and (3) "an overt act was committed in furtherance of the conspiracy that caused the injury" to [the plaintiff].

*Id.* (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). We have also explained that an "[e]xpress agreement among all the conspirators is not necessary to find the existence of a civil

conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *See Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Hooks*, 771 F.2d at 943–44). Here, the civil-rights conspiracy is based on malicious prosecution.

In the context of qualified immunity, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). This individualized assessment "ensure[s] that a defendant's liability is assessed based on his own individual conduct and not the conduct of others." *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015). The district court failed to engage in this individualized assessment on the civil-rights-conspiracy claim. The district court simply reasoned that because the underlying malicious-prosecution claim against Corbitt could proceed, the civil-rights-conspiracy claim against Yeager could also proceed. *See* R. 107 (Dist. Ct. Op. at 20) (Page ID #3379). The district court's short analysis, which considered *none* of Yeager's conduct, was flawed.

To be sure, however, one conspirator's motives can sometimes be imputed to other coconspirators. *See Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) ("Although only two of the four alleged conspirators in this case made openly racist comments, it is clear that all four shared in the general conspiratorial objective . . . . Given Franks's deceptive, and Chapman's obfuscatory, efforts to achieve this goal, we think the openly racial motives of Robinson and Lauderdale can be imputed to Franks and Chapman. We hold that, with the foregoing evidence, Plaintiff raised an issue of fact to support her claim that Defendants conspired against her . . . ."). Furthermore, "Defendants are liable for the acts of their coconspirators," and consequently, the specific defendant in question need not have committed the specific overt act so long as there is a single plan and shared conspiratorial objective. *See Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 460 (6th Cir. 2011).

These general propositions related to conspiracy do not dispose of the individualized assessment requirement. For example, *Weberg*'s holding is in the context of coconspirator defendants who themselves engaged in "deceptive" and "obfuscatory" conduct to achieve the conspiratorial objective. *See Weberg*, 229 F.3d at 528. The court in *Weberg* thus looked to the conduct of the individual officers, while recognizing the reality that "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire . . ." and that "circumstantial evidence may provide adequate proof of conspiracy." *Id.* (quoting *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir. 1984)). Moreover, even though the defendant in question need not commit an overt act himself, a plaintiff must still point to some evidence that the defendant in question shared a conspiratorial objective and entered into an agreement with the codefendants who did commit the overt act. As will be explained, evidence like this against Yeager is missing from this case.

Yeager's own conduct shows that he should receive qualified immunity. "It is absolutely clear . . . that an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials." *See Sykes v. Anderson*, 625 F.3d 294, 314 (6th Cir. 2010). So too here—the Yeager memo is truthful. Crowley admits that he performed the five inspections at issue. The fact that Yeager called the state fire marshal's office to get their evaluation of the situation—and the legal counsel in that office viewed Crowley's conduct as violating the statute—before submitting his memo casts serious doubt on the notion that Yeager shared any conspiratorial objective. Additionally, there is no evidence that Yeager played any role in TBI's investigation or DA Clark's prosecution of Crowley, except being interviewed by Agent Corbitt about the memo and testifying at trial. Yeager may have played *some* role in "causing" Crowley's prosecution in

the sense that the memo outlined statutory violations that provided the basis for the prosecution. But DA Clark and Agent Corbitt engaged in their own five-month investigation and made the ultimate determination of whether those statutory violations were criminal.

Although "the fact that [a defendant] did not *make* the decision to prosecute does not per se absolve them from liability," a plaintiff must still prove that a defendant influenced or participated in the decision. *See Sykes*, 625 F.3d at 311. We have explained that "[t]he meaning of the term 'participated' . . . is akin to 'aided.' To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 308 n.5. Furthermore, "[w]hether an officer influenced or participated in the decision to prosecute hinges on the degree of the officer's involvement and the nature of the officer's actions. The totality of the circumstances informs this fact determination." *Id.* at 311–12 n.9 (citations omitted). This analysis returns us to the discussion above: Yeager turned over a memo that contained accurate information and then did not participate in the investigation or prosecution after that time. Yeager's conduct after that point—an interview and testifying at trial—can safely be called "passive" or "neutral" participation. Nothing suggests that Yeager's conduct was otherwise deceptive or not above board. *See Weberg*, 229 F.3d at 528.

Importantly, no evidence suggests, for example, that Yeager actively supported DA Clark's decision to prosecute Crowley or Agent Corbitt's investigation. Crowley suggests otherwise. *See* Appellee Br. at 7. Crowley cites DA Clark's deposition, at which DA Clark testified that he discussed other legal remedies with Yeager. *See* R. 83-1 (Clark Dep. at 39) (Page ID #1435). DA Clark further testified that "Mr. Yeager indicated that he had encouraged Mr. Crowley to take the licensing test and to try and pass it so that he could be licensed. I don't recall any other discussion." *Id.* at 39–40 (Page ID #1435–36). Contrary to Crowley's contentions, nowhere in the deposition

does DA Clark testify that "Yeager . . . requested a criminal investigation of Crowley." *See* Appellee Br. at 7 (citing this portion of DA Clark's deposition). Hypothetically Yeager could engage in conduct that might fall short of malicious prosecution yet could be enough to show that Yeager shared a conspiratorial objective. But again, any such evidence is absent from this case, and the totality of Yeager's conduct does not evidence that he played a role in this alleged conspiracy.

Crowley's other arguments can be disposed of quickly. First, Crowley latches onto the fact that Yeager was engaged in political battles with the mayor, who appointed Crowley. Specifically, the mayor's supporters had attempted an ouster suit against Yeager. Setting aside the seemingly tenuous argument that Yeager's memo about Crowley's inspections was an attempt to retaliate against the mayor, the ouster suit occurred in May 2014—*after* Yeager wrote and turned over the memo. *See* R. 93 (Yeager Dep. at 44) (Page ID #2504). Second, Crowley suggests, based on a state fire marshal employee's testimony from Crowley's trial, that certain State regulations should be interpreted to mean that the twelve-month grace period begins at the date of first inspection and not from the date of employment. The statute, however, says "date of employment," and it would not be unreasonable for Yeager to have relied on that text. *See* TENN. CODE ANN. § 68-120-113(a)(1).

## IV. REMAINING ISSUES

Yeager forfeited his claim to qualified immunity on the claim of conspiracy to render false testimony by not moving for summary judgment on that claim in the district court. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) (explaining that generally "an argument not raised before the district court is [forfeited] on appeal to this Court."). Moreover, this claim is forfeited on appeal because Yeager failed to raise the issue in his opening brief, and then he raised

11

it in a perfunctory manner (just a one-sentence argument) in his reply brief. *See Engler v. Arnold*, 862 F.3d 571, 577 (6th Cir. 2017); *Golden v. Comm'r*, 548 F.3d 487, 493 (6th Cir. 2008). The upshot is that this claim is not properly before us.

For that reason, we lack jurisdiction over any claim for punitive damages resulting from this remaining claim. Punitive damages cannot be disposed with the appealable issue of qualified immunity for the remaining claim due to Yeager's failure to assert qualified immunity. *See Brennan*, 78 F.3d at 1157. Additionally, although Yeager developed a one-page argument on punitive damages in his reply brief, he further forfeited this issue on appeal by failing to raise it in his opening brief. *See Golden*, 548 F.3d at 493.

## V.  CONCLUSION

For these reasons, we **REVERSE** the district court's ruling on the civil-rights-conspiracy claim. Yeager is entitled to qualified immunity on that claim because he does not have sufficient evidence at summary judgment to establish a constitutional violation, and consequently, Crowley cannot maintain a civil-rights-conspiracy claim against Anderson County either. We also **REMAND** this case for further proceedings consistent with this opinion.